**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MAXUM PETROLEUM, INC., Plaintiff, | |
| v. | Case No. |
| STEPHEN HIATT and CHEMOIL CORPORATION, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | SEPTEMBER 26, 2016 |

**COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF AND JURY DEMAND**

Plaintiff Maxum Petroleum, Inc. ("Maxum"), by undersigned counsel, brings this Complaint for Injunctive and Monetary Relief against Defendants Stephen Hiatt ("Hiatt") and Chemoil Corporation, Inc. ("Chemoil"), and as grounds therefore states as follows:

1. Hiatt held a senior position at Maxum in which he had access to and was well versed in Maxum's proprietary information and trade secrets. He recently resigned, only to surreptitiously assume a similar position at Chemoil, a direct competitor of Maxum. Along the way, Hiatt recruited his friend and former colleague, Randy Ogden, and induced him, as well as two other Maxum employees, to quit Maxum and join Chemoil. As a result of such conduct, Chemoil is now in possession of Maxum's trade secrets and proprietary information, which it will exploit and has already undertaken to exploit for unfair competitive advantage. Hiatt is in breach of an agreement that expressly prohibits the disclosure of Maxum's trade secrets to competitors as well as the solicitation of Maxum's customers and employees.

2. Hiatt worked for Maxum and its predecessor companies for over 25 years, most recently serving as the head of business development for Maxum's Energy business. Without

warning, on August 31, 2016, Hiatt sent an e-mail providing notice of his retirement effective immediately. Hiatt concealed his employment at Chemoil, and Maxum discovered it only when an e-mail showing Hiatt's affiliation with Chemoil mistakenly found its way to Maxum's system.

3. Maxum has good reason to believe that Chemoil hired Hiatt to exploit: (a) his access to and knowledge of Maxum's trade secrets and confidential information to gain an unfair competitive advantage over Maxum in the sale of diesel fuels, and to allow Chemoil to develop its own rig lubricant sales business on the back of Maxum's proprietary knowledge and know how; (b) his inside information concerning Maxum's customer-specific pricing and pricing methodologies; and (c) his knowledge of and relationships with Maxum's key employees. Maxum now faces the prospect of losing critical trade secret and proprietary information to a competitor, and risks losing the value of the millions of dollars it has invested in developing and growing its business over the years.

4. Hiatt's actions breached his fiduciary duty to Maxum and his employment agreement, and he and Chemoil have together misappropriated Maxum's trade secrets in violation of the federal Defend Trade Secrets Act and the Connecticut Uniform Trade Secrets Act, and violated other Connecticut statutes and common law.

## Parties

5. Plaintiff Maxum is a Delaware corporation with its principal place of business in Fort Worth, Texas. Maxum and its affiliates are leading providers of fuel, lubricants and chemicals and related turn-key services to the oil and gas industry, and to a variety of other industrial and commercial customers. Maxum operates its business through a number of affiliated operating companies, using the trade name Pilot Thomas Logistics.

6. Upon information and belief, Defendant Steven Hiatt is a citizen and resident of the State of Oklahoma.

7. Upon information and belief, Defendant Chemoil Corporation, Inc. is and was at all relevant times a California corporation with its principal place of business at 301 Tresser Boulevard, Stamford, Connecticut, 06901. Chemoil Corporation provides fuel and related services to the oil and gas industry, and is a direct competitor to Maxum.

**Jurisdiction and Venue**

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) as this matter presents a federal question. This Court has supplemental jurisdiction over Maxum's state law claims under 28 U.S.C. § 1367(a).

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(3) as Defendant Chemoil is subject to the Court's personal jurisdiction as a citizen and resident of Connecticut, and Defendant Hiatt contractually agreed to submit to the jurisdiction and venue of this Court.

**Factual Allegations**

**The Maxum Energy Business**

10. Since 2012, Maxum has been organized into two principal business units: Energy and Industrial. Energy primarily services customers involved in the drilling, exploration, mining or production of oil, gas and other fossil fuels. Industrial services all other customers, including customers in the marine, automotive, agriculture, steel, rail and trucking sectors.

11. A key component of Energy is its Rig Services business. Maxum offers a variety of products and services to contractors and operators of oil and gas drilling rigs. These products

and services include sourcing and delivery of diesel fuels, coolants, and various lubricants needed to operate the rigs, as well as ancillary services such as preventative maintenance and fluid analysis. Maxum provides products and services to hundreds of rigs, and this portion of its business generates significant annual revenue. A significant number of the operating oil and gas rigs in the continental United States purchase lubricant products from Maxum.

12. Energy also sells millions of gallons of its private label SPX branded oil. SPX is specially formulated for the specific needs of oil and gas drillers, and is blended by a major supplier using a proprietary and confidential formulation developed in accordance with Maxum specifications and requirements.

13. Maxum's strong competitive position in the rig services market is the product of many years of its development of proprietary information and protected trade secrets. For example, although some basic information about the rigs is publically available, that information is only of limited use to sellers of rig products and services. Effective and customized delivery of fuel and lubricant products and services requires in depth knowledge of rig operations, rig personnel, rig procurement requirements, engine specifications, and rig specifications, such as engine type, horsepower, type of drilling, whether the rig is operated continuously (24 hours) or with breaks, whether the drilling project is short-term or long-term, and so on.

14. Maxum has taken years to amass all of this critical proprietary customer information about rig specifications. Maxum's sales and marketing personnel know much of this information by virtue of their long collaboration with Maxum customers and their familiarity with the customers' business. In addition, Maxum has digested and organized this information in ways that make it particularly useful: it maintains and updates various electronic spreadsheets to

record this critical market information. Access to that data is strictly limited to pricing team members.

15. Maxum has also built up extensive logistics networks, supply points, supply relationships, and knowledge about the various components of the supply chain for the delivery of diesel fuel. This proprietary knowledge allows it to provide effective and efficient fuel deliveries to customers across a wide geographic area.

16. Defendant Chemoil competes with Maxum on the diesel fuel side of the rig services market. Chemoil's competitive diesel fuel business, however, lacks Maxum's broader geographic reach. Rather, Chemoil's diesel fuel sales are limited to a few geographic regions. It would be impossible for a competing firm like Chemoil to match Maxum's competitive advantage in terms of geographic reach and spread without first expending the resources necessary to acquire detailed and in depth knowledge about the sourcing and delivery of diesel oil products across the continental United States. Chemoil has also recently begun to compete against Maxum in selling lubricants to oil rig customers.

17. One important aspect of Maxum's Energy business is its pricing. Pricing of lubricant and fuel products can be quite complex. It turns on the analysis of numerous individual product components, which are then aggregated or "built up" above the acquisition cost of the base oil. Knowledge of the numbers and methods used by a competitor in its pricing build up can easily be exploited to disadvantage that competitor to take away business. In particular, the methods employed in the "build up" process are used to get from an initial acquisition cost to a final invoice price, and the specific amounts associated with each pricing component – especially with regard to margin and freight – are among the most sensitive trade secrets Maxum possesses.

Exposure of this information to a competitor would give them a clear roadmap to take business away from Maxum.

**Measures Taken by Maxum to Secure Confidential Information**

18. Maxum employs a variety of means and policies to protect the integrity of its confidential information.

19. Access to Maxum's electronics systems is strictly controlled through the use of passwords and access authorizations. Maxum's written employment policy, which all employees (other than drivers) are required to review and sign, prohibits disclosure of passwords and access authorizations to any other persons, and further requires employees to select difficult to identify passwords and change them on a regular basis. Any employee who leaves the company must immediately turn over all uniform, keys, security cards, ID badges, software and any proprietary information in their possession.

20. Employees are only permitted to access their own files and those system documents and data that they are specifically authorized to access by virtue of their position. Employees are prohibited from viewing the files of others. Finally, employees may not disclose or transmit any confidential or privileged information to any unauthorized parties.

21. As a further control, the written policy contains an absolute prohibition on the use of personal hardware or software on company electronic systems. Furthermore, with respect to Maxum's own hardware, peripherals and software, employees are prohibited from making any modifications, additions or deletions without express approval. More specifically, there is a blanket prohibition on the installation of communications programs such as internet access software.

22. Maxum's written employment policy also specifically addresses the treatment of confidential information. The policy instructs that "[b]ecause [Maxum] operates in an

environment where our competitors are intensely interested in obtaining financial and operational information, Team Members who are privy to such information must safeguard and protect its disclosure. If asked to share confidential information, codes or log-ins, immediately terminate the conversation and notify your supervisor or Manager. Likewise, a Team Member who questions whether information he/she originates or acquires may be confidential has a responsibility to ask the immediate supervisor or Manager."

23. In addition to the obligations imposed by Maxum's written employment policy, Maxum imposed a code of business conduct on its employees. Among other provisions this code of conduct directs that "[c]onfidential information regarding [Maxum's] operations and business activities is essential to the conduct of our business. We operate in a very competitive environment and our competitors are intensely interested in obtaining [Maxum's] financial and operating information. Confidential information includes any information that is not common, public knowledge and/or known to competitors, customers, suppliers, and others (including other Team Members . . . who do not have a valid business reason for obtaining this information). Any Team Member who possesses confidential information shall take all steps necessary to safeguard and protect such information from disclosure." Employees are also instructed to use caution in e-mail communications and limit recipients on a "need to know basis."

24. Maxum takes additional steps to monitor and enforce compliance with these mandatory corporate policies. The company reserves the right to access, monitor, review, delete and audit all content or usage on its information system, at any time, and without any notice. With respect to certain sensitive proprietary information, Maxum puts in place restrictions to limit who can access the data internally.

25. For example, with respect to customer specific pricing information, there are special access restrictions in place. Customer material descriptions can be accessed by any member of Maxum's operations team. However, the pricing data is not loaded into this display. That data is only accessible by enumerated employees with specific responsibility for pricing.

**Defendant Hiatt's Tenure at Maxum and His Agreement to Protect its Trade Secrets**

26. Hiatt worked in sales, business development, and leadership capacities with Maxum or its predecessors beginning in 1991 and continuing until August 31, 2016.

27. By 2012, Hiatt was Vice President for Sales for the Energy division. In that position, he had overall responsibility for sales for the entire division, including for the flagship Rig Services business. That business services on-shore drilling rigs across the entire continental United States.

28. By virtue of his long tenure at Maxum and senior position, Hiatt had access to and direct knowledge of Maxum's most commercially sensitive proprietary information and trade secrets. All of the critical information discussed above – customer contact information, detailed specifications of customer rigs, supply chains, sourcing, pricing methods, and specific inputs to pricing with respect to each customer – was known intimately by Hiatt. Put simply, Maxum's crown jewels – the key confidential information that underpins Maxum's competitive position in the marketplace – are contained in Hiatt's mind.

29. Because of Hiatt's intimate familiarity with Maxum's most competitive sensitive trade secret information, the company made vigorous efforts to safeguard its legitimate competitive concerns. In particular the Agreement contains detailed provisions that were carefully and precisely tailored to guard against the danger that would be posed should Hiatt leave to company and take his knowledge of Maxum trade secrets to a competitor.

30. Hiatt acknowledged his knowledge of critical Maxum trade secrets in his most recent written employment agreement with Maxum, as of February 15, 2012 (the "Agreement").

31. Maxum does not have a policy of requiring every employee to sign such detailed restrictive covenants as are set forth in the Agreement. Rather, the presence of such provisions in the Agreement and the very need to execute the Agreement reflects Hiatt's unique and special position at the company and access to proprietary Maxum information.

32. More specifically, the Agreement bars Hiatt from disclosing in any way, directly or indirectly, any of Maxum's trade secrets or proprietary information. Hiatt further acknowledges that certain responsibilities and positions with other companies in the industry would therefore be barred to him should he leave Maxum, because they would lead to the inevitable disclosure of Maxum's trade secrets and other confidential information. Accordingly, Hiatt agreed that he would not take any subsequent employment opportunity without first informing Maxum's general counsel to review that opportunity and confirm that it would not inevitably result in the disclosure of protected company information.

33. In addition, the Agreement prohibits Hiatt from soliciting either Maxum employees or Maxum customers for a period of 18 months following his departure from Maxum.

**Hiatt's Departure**

34. On August 31, 2016, Hiatt sent an e-mail to Maxum's CEO, Scott Prince, giving notice of his immediate resignation from Maxum.

35. Hiatt's resignation e-mail is very brief and gives no indication that he intends to take employment anywhere else. It states simply that he is resigning and he then thanks his former colleagues.

36. Upon leaving Maxum, Hiatt also did not change his LinkedIn page to suggest he had taken on any employment elsewhere. As of the day these papers were filed, Hiatt's LinkedIn page still states that his is employed at Maxum, under its trade name Pilot Thomas Logistics.

37. Accordingly, as of September 19, 2016, Maxum had no reason to believe that Mr. Hiatt had accepted any other position in the industry.

38. On September 19, 2016, however, Hiatt sent a communication to Randy Ogden, his former Maxum colleague and now an employee at Chemoil. This communication found its way to the Maxum e-mail servers, because Hiatt sent it to Ogden's old "pilotthomas.com" (i.e. Maxum) e-mail address. The communication revealed Hiatt's use of a "chemoil.com" e-mail address.

39. Maxum also recently learned of unusual behavior by Hiatt in the weeks and days leading up to his surreptitious departure to Chemoil.

40. On July 1, 2016, one of Maxum's biggest drilling customers, with over $100 million in annual revenue, sent Hiatt an updated proposal for his signature. Under usual Maxum policy, such a request would normally be processed and sent back in a matter of days. But Hiatt simply sat on it, neither executing the proposal nor informing anyone else about it. When he left two months later, no action had been taken, nor did he inform anyone at Maxum that action was needed.

41. Maxum did not learn about the unexecuted proposal until September 19, 2016, when the customer brought it to Maxum's attention.

**<u>The Coordinated Departure of Others in Hiatt's Sales Organization</u>**

42. Hiatt was not the only Maxum employee to be poached by Chemoil.

43. Minutes after Hiatt resigned on August 31, 2016, Randy Ogden also announced his resignation. Ogden then took a new job at Chemoil.

44. On September 7, Maxum employees Todd King and Phillip DeLong also left Maxum for Chemoil. King and DeLong both were formerly employed in Hiatt and Ogden's sales organization. King and DeLong worked entirely in lubricant sales.

45. Maxum is not aware of any involvement of Chemoil in the lubricant sales business prior to Hiatt's departure on August 31.

**Hiatt Is Hired By Chemoil to Attack Maxum's Business**

46. Upon information and belief, Hiatt is now a leading executive in a senior sales position at Chemoil in which he is performing the same or a similar role to that which he performed at Maxum. Indeed, until recently, Chemoil did not even have a rig lubricant business line. Hiatt is in a position to help Chemoil develop this nascent line by virtue of his exposure to Maxum trade secrets.

47. Upon information and belief, Chemoil hired Hiatt to exploit: (a) his access to and knowledge of Maxum's trade secrets and confidential information to gain an unfair competitive advantage over Maxum in the sale of diesel fuels, and to allow Chemoil to develop its own rig lubricant sales business on the back of Maxum's proprietary knowledge and know how; (b) his inside information concerning Maxum's customer-specific pricing and pricing methodologies; and (c) his knowledge of and relationships with Maxum's key employees.

48. On September 19, 2016, a Maxum employee conducting a routine sales visit with a drilling customer was informed that Chemoil had approached that customer seeking to sell lubricant products. Prior to Hiatt's hiring, Chemoil had no presence whatsoever in lubricant sales. It would not have been able to enter that market so quickly without exploiting the confidential information obtained by Hiatt while employed at Maxum.

49. Upon information and belief, Defendants are using for their own benefit Maxum's most commercially sensitive proprietary information and trade secrets, including but not limited to, details about customer contacts, specific customer product needs, detailed specifications of customer rigs, costs, pricing, pricing methodology, supply chains and sourcing, logistics, and marketing.

50. Upon information and belief, Defendants are using for their own benefit Maxum's confidential formulation, cost and pricing of Maxum's private SPX brand of oil and lubricants, to develop a competing product offering.

51. Upon information and belief, Hiatt solicited Randy Ogden, Todd King, and Phillip DeLong to quit working for Maxum and to accept employment with Chemoil. On information and belief, Hiatt, Ogden, King and DeLong all, jointly and individually, utilized Maxum company property and coordinated mutually beneficial employment arrangements at Chemoil along with utilizing Maxum's sensitive information for their personal gain and the financial gain of Chemoil.

52. Upon information and belief, Hiatt also has solicited numerous Maxum customers in an attempt to win their business away from Maxum.

53. As a consequence of defendants' actions, Maxum faces the prospect of losing its most critical trade secrets and proprietary information in its Energy business to a competitor, and risks losing the value of the millions of dollars it invested in this business over the years.

## COUNT I

## BREACH OF CONTRACT
## STEPHEN HIATT

54. Plaintiff incorporates by reference paragraphs 1-53, above, as though fully set forth herein.

55. Hiatt and Maxum entered into an Employment Agreement on February 15, 2012. A true and correct copy of this Agreement is attached hereto as Exhibit 1.

56. Hiatt has breached and continues to breach his Employment Agreement by, among other things, using and disclosing Maxum confidential information and trade secrets and by soliciting Maxum employees and customers to switch their employment or business to Chemoil.

57. Maxum performed all of its obligations under the Agreement.

58. As a direct and proximate result of Hiatt's multiple breaches of the Agreement, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill and an irreparable loss of the confidentiality of its sensitive and valuable business information, for which it has no adequate remedy at law.

**COUNT II**

**BREACH OF FIDUCIARY DUTY**
**STEPHEN HIATT**

59. Plaintiff incorporates by reference paragraphs 1-58, above, as though fully set forth herein.

60. At all times during his employment, Hiatt owed Maxum a fiduciary duty of complete loyalty and fidelity to Maxim's interests. At all times during the course of his employment, Hiatt was obligated to act solely and exclusively in Maxum's best interests and was prohibited from acting in a manner contrary to Maxum's legitimate business interests.

61. Hiatt breached his fiduciary duties and obligations to Maxum by: (a) misappropriating Maxum's proprietary and confidential information and trade secrets and furnishing that information to Chemoil, a competitor of Maxum; and (b) while still employed by

Maxum, arranging for the solicitation of Maxum's employees and customers to transfer their business to Chemoil.

62. Hiatt also breached his fiduciary duties to Maxum by making secret plans with others, while he was still employed by Maxum, to deprive Maxum of its employees, clients, and trade secrets.

63. As a direct and proximate result of Hiatt's breaches of his fiduciary duties to Maxum, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its highly sensitive and valuable business information, for which it has no adequate remedy at law.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS
## DEFEND TRADE SECRETS ACT
## STEPHEN HIATT AND CHEMOIL

64. Plaintiff incorporates by reference paragraphs 1-63, above, as though fully set forth herein.

65. Maxum owned and possessed certain confidential, proprietary, and trade secret information, including but not limited to, details about customer contacts, specific customer product needs, detailed specifications of customer rigs, costs, pricing, pricing methodology, supply chains and sourcing, logistics, and marketing, as alleged above.

66. This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce.

67. Maxum has taken reasonable measures to keep such information secret.

68. This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

69. In violation of Maxum's rights under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Defendants misappropriated the confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein.

70. Defendants' misappropriation of the information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

71. As the direct and proximate result of Defendants' conduct, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information, for which it has no adequate remedy at law.

## COUNT IV

## MISAPPROPRIATION OF TRADE SECRETS
## CONNECTICUT UNIFORM TRADE SECRETS ACT
## STEPHEN HIATT AND CHEMOIL

72. Plaintiff incorporates by reference paragraphs 1-71, above, as though fully set forth herein.

73. Maxum owned and possessed certain confidential, proprietary, and trade secret information, as alleged above.

74. This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

75. Maxum has taken reasonable measures to keep such information secret.

76. The conduct of Defendants, described above, constitutes misappropriation of Maxum's proprietary information and trade secrets in violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50, *et seq*.

77. Defendants' misappropriation of the information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

78. As the direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information, for which it has no adequate remedy at law.

## COUNT V

## CONVERSION
## STEPHEN HIATT AND CHEMOIL

79. Plaintiff incorporates by reference paragraphs 1-78, above, as though fully set forth herein.

80. Defendants unlawfully misappropriated and converted Maxum's confidential and proprietary information for their own personal advantage and to solicit Maxum's employees and clients to transfer their business to Chemoil. Such misconduct was to the detriment of Maxum, and was performed without the knowledge or consent of Maxum.

81. Defendants' actions were taken with reckless indifference to the rights of Maxum and/or in intentional and wanton violation of those rights.

82. As the direct and proximate result of Defendants' conduct, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information, for which it has no adequate remedy at law.

## COUNT VI

## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT
## STEPHEN HIATT AND CHEMOIL

83. Plaintiff incorporates by reference paragraphs 1-82, above, as though fully set forth herein.

84. Defendants' conduct in improperly taking Maxum's confidential, proprietary and trade secret information and using that information to solicit Maxum's clients to transfer their business to Chemoil is unethical, unscrupulous, unfair, deceptive, an d constitutes an unfair method of competition or trade practice in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*

85. Defendants' conduct was intentional, knowing, willful, malicious, fraudulent, and oppressive.

86. Defendants' conduct was carried out for the purpose of competing unfairly with Maxum.

87. As the direct and proximate result of Defendants' conduct, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information, for which it has no adequate remedy at law.

## COUNT VII

## COMMON LAW UNFAIR COMPETITION
## STEPHEN HIATT AND CHEMOIL

88. Plaintiff incorporates by reference paragraphs 1-87, above, as though fully set forth herein.

89. The conduct of Defendants, described above, constitutes common law unfair competition.

90. As a direct and proximate result of the acts and course of conduct of Defendants, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information.

**COUNT VIII**

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CHEMOIL**

91. Plaintiff incorporates by reference paragraphs 1-90, above, as though fully set forth herein.

92. Chemoil has poached four of Maxum's former sales representatives.

93. Maxum had an established economic relationship with each of the four poached employees, and Maxum reasonably expected that its economic relationships with those employees would continue.

94. Chemoil intentionally interfered with each of those relationships, and the timing and circumstances of their departure evidences malice and an intent to inflict harm on Maxum.

95. As the direct and proximate result of Chemoil's conduct, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information, for which it has no adequate remedy at law.

**COUNT IX**

**TORTIOUS INTERFERENCE WITH CONTRACT CHEMOIL**

96. Plaintiff incorporates by reference paragraphs 1-95, above, as though fully set forth herein.

97. Defendant Hiatt is in open breach of his Employment Agreement.

98. Upon information and belief, Chemoil was aware of Hiatt's Employment Agreement and the restrictive covenants therein, and induced Hiatt to breach those covenants in violation of his contract with Maxum.

99. These breaches have led to actual and threatened misappropriation of trade secrets, proprietary information, reputation, and good will.

100. Chemoil intentionally interfered with Hiatt's Employment Agreement, and acted with malice and an intent to inflect harm on Maxum.

101. As the direct and proximate result of Chemoil's conduct, Maxum has suffered and will continue to suffer irreparable financial loss, loss of goodwill, and an irreparable loss of the confidentiality of its proprietary information, for which it has no adequate remedy at law.

**Requested Relief**

Plaintiff demands a trial by jury and respectfully requests that this Court:

A. Enter a Temporary Restraining Order and/or a Preliminary Injunction Order immediately restraining and enjoining Defendants, from directly or indirectly:

1. Employing Defendant Hiatt, Randy Ogden, Todd King, and Phillip DeLong in any capacity, or at least in any position with duties relating to sales of products or services to customers in the Rig Services business;

2. Soliciting any business from any Maxum client or customer;

3. Soliciting any current or recent former Maxum employees for employment at Chemoil;

4. Using, disclosing, or transmitting for any purpose (including but not limited to solicitation of clients) any of Maxum's confidential or proprietary business information,

including but not limited to the names, addresses, and specific information about Maxum's customers and information related to Maxum's pricing; and

5. Requiring Hiatt and Chemoil to return immediately to Maxum all originals, copies or other reproductions, in any form whatsoever, of any document of Maxum, and (after preserving all materials in an appropriate manner for purposes of this litigation, including all metadata) to purge or destroy any computerized records Maxum that are within Hiatt's possession, custody or control;

B. Grant a Permanent Injunction restraining and enjoining Defendants from the conduct set forth in subparagraphs A(1)-A(4) above;

C. Award Maxum monetary damages in an amount to be determined at trial;

D. Award Maxum all costs and expenses incurred in connection with this action, including its reasonable attorneys' fees; and

E. Grant Maxum such other and further relief as the Court deems just and equitable.

Respectfully submitted,

THE PLAINTIFF,
MAXUM PETROLEUM, INC.

By: */s/ David T. Grudberg*
David T. Grudberg (Federal Bar No. ct01186)

**CARMODY TORRANCE SANDAK & HENNESSEY LLP**
195 Church Street, 18th Floor
P.O. Box 1950
New Haven, CT 06509
Tel.: (203) 777-5501
Fax: (203) 784-3199 (fax)
E-mail: dgrudberg@carmodylaw.com

Jonathan Bach (*Pro Hac Vice* Admission Pending)
Jason Koral (*Pro Hac Vice* Admission Pending)

**COOLEY LLP**
1114 Avenue of the Americas
New York, New York 10036
Tel.: (212) 479-6000
E-mail: jbach@cooley.com
jkoral@cooley.com

*Attorneys for Plaintiff Maxum Petroleum, Inc.*